**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

07 - 14305

RICHARD and LINDA COY, Individually and On )
Behalf of All Others Similarly Situated, )

CIV-MARTINEZ

CIVIL ACTION NO.

MAGISTRATE JUDGE
LYNCH

Plaintiffs, )

vs. )                                    CLASS ACTION COMPLAINT
)

OPTEUM INC., ROBERT E. CAULEY, PETER R. )
NORDEN, JEFFREY J. ZIMMER, MARTIN J. )    **JURY TRIAL DEMANDED**
LEVINE, KEVIN L. BESPOLKA, MAUREEN A. )
HENDRICKS, W. CHRISTOPHER )
MORTENSON, BUDFORD H. ORTALE, )
FLAGSTONE SECURITIES, LLC, and BB&T )
CAPITAL MARKETS, )
)
)
Defendants. )

Plaintiffs, Richard and Linda Coy ("Plaintiffs"), allege the following based upon the

investigation by Plaintiffs' counsel, which included, among other things, a review of the

defendants' public documents, conference calls and announcements made by defendants, United

States Securities and Exchange Commission ("SEC") filings, wire and press releases published

by and regarding Opteum Inc. ("Opteum" or the "Company"), securities analysts' reports and

advisories about the Company, and information readily available on the Internet, and Plaintiffs

believe that substantial additional evidentiary support will exist for the allegations set forth

herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action on behalf of those who purchased or otherwise

acquired Opteum's common stock pursuant or traceable to the Company's September 17, 2004

Initial Public Offering (the "IPO" or the "Offering") or the Company's December 16, 2004 Secondary Offering (the "Secondary Offering"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act"), and including those who purchased or otherwise acquired the Company's common stock between November 3, 2005 and May 10, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     On May 10, 2007, the Company shocked investors when it reported its first quarter 2007 financial and operational results. The Company reported a $12.2 million negative fair value adjustment to Opteum Financial Services, LLC's ("OFS") mortgage servicing rights, $1.3 million in negative fair value adjustments to OFS's residuals, and $8.8 million in asset write downs at OFS. Additionally, the Company revealed that nearly 50 percent of the Company's first quarter net loss, or $37.4 million, was attributable to "a valuation allowance on OFS's deferred tax assets. Nearly 17.5% of the first quarter net loss was attributable to negative fair value adjustments to OFS's mortgage servicing rights and retained interests in securitizations. Slightly more than 10% of the first quarter net loss was attributable to asset write downs at OFS due in part to the Company's decision to exit the mortgage origination business." Also, the Company revealed that its $18.0 million first quarter loss on mortgage banking activities included a $14.1 million negative fair value adjustment to mortgage loans held for sale and interest rate lock commitments, a $1.3 million negative fair value adjustment to retained interests in securitizations, and hedging losses of $4.6 million.

3.     On this news, shares of the Company's stock fell $1.37 per share, or over 25 percent, to close on May 11, 2007 at $4.08 per share, on unusually heavy trading volume.

4.     The Complaint alleges that, in connection with the Company's IPO and Secondary

Offering, the defendants failed to disclose or indicate the following: (1) that the Company's interest costs at the time of the IPO and Secondary Offering were substantially increasing; (2) that as a result, the Company's various approaches to risk management did not provide investors reasonable protections against losses; and (3) that the Company lacked adequate internal and financial controls.

5. Additionally, throughout the Class Period, defendants failed to disclose additional material adverse facts about the Company's financial well-being, business relationships, and prospects. Specifically, defendants failed to disclose or indicate the following: (1) that the Company's integration of OFS was not proceeding according to plan; (2) that the Company's risk management controls and procedures were incompatible with OFS' risk management controls and procedures; (3) that OFS' loans were designed to produce short-term financial results, which would subject the Company to unreasonable long-term risk and expenses; (4) that the Company had improperly valued and monitored collateral; (5) that the Company had underreported its loan loss reserves; (6) that the Company's book value and projected cash flows were materially overstated; (7) that the Company had failed to adequately hedge its exposure to losses; (8) that the Company and OFS lacked adequate internal and financial controls; (9) that the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); (9) that, as a result of the above, the Company's financial statements were false and misleading at all relevant times; and (10) that, as a result of the foregoing, the Company's guidance about its 2007 financial and operational results were lacking in any reasonable basis when made.

6. As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiffs and other Class Members have

suffered significant losses and damages.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v) and pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

9.     Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act and pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, the Company's principal executive offices are located within this Judicial District.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

11.     Plaintiffs, Richard and Linda Coy, as set forth in the accompanying certification, incorporated by reference herein, purchased Opteum's common stock at artificially inflated prices during the Class Period and have been damaged thereby.

12.     Defendant Opteum is a Maryland corporation with its principal place of business

located at 3305 Flamingo Drive, Vero Beach, Florida.

13.     Defendant Robert A. Cauley ("Cauley") was, at all relevant times, the Company's Chief Financial Officer ("CFO"), Chief Investment Officer, Senior Executive Vice President, and Vice-Chairman of the Board of Directors.

14.     Defendant Peter R. Norden ("Norden") was, at all relevant times, the Company's Senior Executive Vice President and a member of the Board of Directors.  Defendant Norden was also the President of OFS.

15.     Defendant Jeffrey J. Zimmer ("Zimmer") was, at all relevant times, the Company's Chief Executive Officer ("CEO") and Chairman of the Board of Directors.

16.     Defendant Martin J. Levine ("Levine") was, at all relevant times, the Company's Executive Vice President, as well as OFS' Chief Operations Officer.

17.     Defendant Kevin L. Bespolka ("Bespolka") was, at all relevant times, a member of the Company's Board of Directors.

18.     Defendant Maureen A. Hendricks ("Hendricks") was, at all relevant times, a member of the Company's Board of Directors.

19.     Defendant W. Christopher Mortenson ("Mortenson") was, at all relevant times, a member of the Company's Board of Directors.

20.     Defendant Buford H. Ortale ("Ortale") was, at all relevant times, a member of the Company's Board of Directors.

21.     Defendants Cauley, Norden, Zimmer, Levine, Bespolka, Hendricks, Mortenson, and Ortale are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Opteum's reports to the SEC, press releases and presentations to securities

5

analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

22.     Defendants Flagstone Securities, LLC ("Flagstone") and BB&T Capital Markets ("BB&T") were lead underwriters of the Company's IPO and Secondary Offering. Defendants Flagstone and BB&T served as financial advisors and assisted in the preparation of Opteum's IPO and Secondary Offering materials. Defendants Flagstone and BB&T are collectively referred to hereinafter as the "Underwriter Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

23.     Opteum is a REIT which operates an integrated mortgage-related investment portfolio and a mortgage origination platform. As of September 28, 2007, the Company changed its name to Bimini Capital Management Inc.

### Materially False and Misleading
### Statements Made in its IPO Registration Statement

24.     On September 17, 2004 the Company conducted its IPO. In connection with its IPO, the Company filed a Registration Statement and Prospectus (collectively referred to as the

"Registration Statement") with the SEC.  The IPO was a financial success for the Company, as it raised $72.5 million in gross proceeds by selling 5 million shares of stock to investors at a price of $14.50 per share.

25.    Regarding the Company's differentiation and asset acquisition strategy, the Registration Statement, in relevant part, stated:

> *We seek to differentiate ourselves from other mortgage portfolio managers through our approach to risk management.* We invest in a limited universe of mortgage related securities, primarily those issued by Fannie Mae, Freddie Mac and Ginnie Mae. Payment of principal and interest underlying securities issued by Ginnie Mae is guaranteed by the U.S. Government. Fannie Mae and Freddie Mac mortgage related securities are guaranteed as to payment of principal and interest by the respective agency issuing the security. We seek to manage the risk of prepayments of the underlying mortgages by creating a diversified portfolio with a variety of prepayment characteristics. Finally, we seek to address interest rate risks by managing the interest rate indices and borrowing periods of our debt, as well as through hedging against interest rate changes.
>
> *We have implemented a risk-based capital methodology patterned on the general principles underlying the proposed risk-based capital standards for internationally active banks* of the Basel Committee on Banking Supervision, commonly referred to as the Basel II Accord. The Basel II Accord encourages banks to develop methods for measuring the risks of their banking activities to determine the amount of capital required to support those risks. *Similarly, we use our methodology to calculate an internally generated risk measure for each asset in our portfolio. This measure is then used to establish the amount of leverage we use. We expect our risk management program to reduce our need to use hedging techniques.* [Emphasis added.]
>
> * * *
>
> The primary assets in our current portfolio of mortgage related securities are fixed-rate mortgage-backed securities, floating rate collateralized mortgage obligations, adjustable-rate mortgage-backed securities, hybrid adjustable-rate mortgage-backed securities and balloon maturity mortgage-backed securities. *The mortgage related securities we acquire are obligations issued by*

> *federal agencies or federally chartered entities, primarily Fannie Mae, Freddie Mac and Ginnie Mae.*
>
> We seek to manage the effects on our income of prepayments of the mortgage loans underlying our securities at a rate materially different than anticipated. *Our diversified portfolio includes securities with prepayment characteristics that we expect to result in slower prepayments, such as pools of mortgage-backed securities collateralized by mortgages with low loan balances, mortgages originated under Fannie Mae's Expanded Approval Program or agency pools collateralized by loans against investment properties.*
>
> * * *
>
> We have created and will maintain a diversified portfolio to avoid undue geographic, loan originator, and other types of concentrations. *By maintaining essentially all of our assets in government or government-sponsored or chartered enterprises and government or federal agencies, which may include an implied guarantee of the federal government as to payment of principal and interest, we believe we can significantly reduce our exposure to losses from credit risk.* We intend to acquire assets that will enable us to be exempt from the Investment Company Act. [Emphasis added.]

26.     With regard to the Company's strategies for countering market risk, the Registration Statement, in relevant part, stated:

> *We believe the primary risk inherent in our investments is the effect of movements in interest rates.* This arises because the changes in interest rates on our borrowings will not be perfectly coordinated with the effects of interest rate changes on the income from, or value of, our investments. *We therefore follow an interest rate risk management program designed to offset the potential adverse effects resulting from the rate adjustment limitations on our mortgage related securities. We seek to minimize differences between interest rate indices and interest rate adjustment periods of our adjustable-rate mortgage-backed securities and related borrowings by matching the terms of assets and related liabilities both as to maturity and to the underlying interest rate index used to calculate interest rate charges.*
>
> *Our interest rate risk management program encompasses a number of procedures, including the following:*

8

- *monitoring and adjusting, if necessary, the interest rate sensitivity of our mortgage related securities* compared with the interest rate sensitivities of our borrowings.

- *attempting to structure our repurchase agreements that fund our purchases of adjustable-rate mortgage-backed securities to have a range of different maturities and interest rate adjustment periods.* We attempt to structure these repurchase agreements to match the reset dates on our adjustable-rate mortgage-backed securities. At June 30, 2004, the weighted average months to reset of our adjustable-rate mortgage-backed securities was 4.6 months and the weighted average reset on the corresponding repurchase agreements was 3.8 months; and

- *actively managing, on an aggregate basis, the interest rate indices and interest rate adjustment periods of our mortgage related securities compared to the interest rate indices and adjustment periods of our borrowings.* Our liabilities under our repurchase agreements are all LIBOR-based, and we select our adjustable-rate mortgage-backed securities to favor LIBOR indexes. As of June 30, 2004, over 79% of our adjustable-rate mortgage-backed securities were LIBOR-based.

*As a result, we expect to be able to adjust the average maturities and reset periods of our borrowings on an ongoing basis by changing the mix of maturities and interest rate adjustment periods as borrowings mature or are renewed. Through the use of these procedures, we attempt to reduce the risk of differences between interest rate adjustment periods of our adjustable-rate mortgage-backed securities and our related borrowings.*

* * *

*As a further means of protecting our portfolio against the effects of major interest rate changes we may employ a limited hedging strategy* under which we purchase interest rate cap contracts (under which we would generally be entitled to payment if interest rate indices exceed the agreed rates) or rate lock or other guaranteed financing contracts (under which we would pay a fee to guarantee certain lines of borrowing at certain rates or for certain periods of time). *Under these contracts we would generally only be at risk for the fees paid. These contracts are intended to protect us from significant increases in interest rates.* [Emphasis added.]

27. Finally, regarding the Company's "Asset Tests," the Registration Statement, in

relevant part, stated:

> ***At the close of each quarter of our taxable year, we must satisfy four tests relating to the nature and diversification of our assets:***
>
> • at least 75% of the value of our total assets must be represented by qualified real estate assets, cash, cash items and government securities;
>
> • not more than 25% of our total assets may be represented by securities, other than those securities included in the 75% asset test;
>
> • of the investments included in the 25% asset class, the value of any one issuer's securities may not exceed 5% of the value of our total assets, and we generally may not own more than 10% by vote or value of any one issuer's outstanding securities, in each case except with respect to securities of any qualified REIT subsidiaries or taxable REIT subsidiaries and in the case of the 10% value test except with respect to "straight debt" having specified characteristics; and
>
> • the value of the securities we own in any taxable REIT subsidiaries, in the aggregate, may not exceed 20% of the value of our total assets.
>
> Qualified real estate assets include interests in mortgages on real property to the extent the principal balance of a mortgage does not exceed the fair market value of the associated real property, regular or residual interests in a REMIC (except that, if less than 95% of the assets of a REMIC consists of "real estate assets" (determined as if we held such assets), we will be treated as holding directly our proportionate share of the assets of such REMIC), and shares of other REITs. Non-REMIC CMOs, however, generally do not qualify as qualified real estate assets for this purpose.
>
> * * *
>
> ***We believe that all or substantially all of the mortgage related securities that we own are and will be qualifying assets for purposes of the 75% asset test.*** However, to the extent that we own non-REMIC CMOs or other debt instruments secured by mortgage loans (rather than by real property) or debt securities issued by other REITs or C corporations that are not secured by mortgages on real property, those securities will not be qualifying assets for purposes of the 75% asset test. ***We will monitor the status of our assets for purposes of the various asset tests and will seek to***

*manage our portfolio to comply at all times with such tests.*
[Emphasis added.]

28.    The statements contained in ¶¶ 25 – 27 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that the Company's interest costs at the time of the IPO were substantially increasing; (2) that as a result, the Company's various approaches to risk management did not provide investors reasonable protections against losses; and (3) that the Company lacked adequate internal and financial controls.

## Materially False and Misleading
## Statements Made in its Secondary Offering Prospectus

29.    On December 16, 2004, the Company completed a Secondary Offering.  In connection with this Secondary Offering, the Company filed a Prospectus (referred to as the "Prospectus") with the SEC.  The Secondary Offering was also a financial success for the Company, as it was able to raise an additional $62 million in gross proceeds by selling 4 million shares to investors at a price of $15.50 per share.

30.    Regarding the Company's differentiation and asset acquisition strategy, the Prospectus, in relevant part, stated:

> *We seek to differentiate our company from other mortgage portfolio managers through our approach to risk management.* We invest in a limited universe of mortgage related securities, primarily those issued by Fannie Mae, Freddie Mac and Ginnie Mae. Payment of principal and interest underlying securities issued by Ginnie Mae is guaranteed by the U.S. Government. Fannie Mae and Freddie Mac mortgage related securities are guaranteed as to payment of principal and interest by the respective agency issuing the security. We seek to manage the risk of prepayments of the underlying mortgages by purchasing securities with prepayment characteristics that we expect to result in slower prepayments, such as pools of mortgage-backed securities collateralized by mortgages with low loan balances, mortgages originated under Fannie Mae's

Expanded Approval Program or agency pools collateralized by loans against investment properties.

The primary assets in our current portfolio of mortgage related securities are fixed-rate mortgage-backed securities, floating rate collateralized mortgage obligations, adjustable-rate mortgage-backed securities, hybrid adjustable-rate mortgage-backed securities and balloon maturity mortgage-backed securities. The mortgage related securities we acquire are obligations issued by federal agencies or federally chartered entities, primarily Fannie Mae, Freddie Mac and Ginnie Mae.

***We have created and will maintain a diversified portfolio*** in order to avoid undue loan originator, geographic and other types of concentrations. ***We seek to manage the effects on our income of prepayments of the mortgage loans underlying our securities, at a rate materially different than anticipated, by structuring a diversified portfolio with a variety of prepayment characteristics and investing in mortgage related securities or structures with prepayment protections.*** [Emphasis added.]

\* \* \*

The primary assets in our current portfolio of mortgage related securities are fixed-rate mortgage-backed securities, floating rate collateralized mortgage obligations, adjustable-rate mortgage-backed securities, hybrid adjustable-rate mortgage-backed securities and balloon maturity mortgage-backed securities. ***The mortgage related securities we acquire are obligations issued by federal agencies or federally chartered entities, primarily Fannie Mae, Freddie Mac and Ginnie Mae.***

We seek to manage the effects on our income of prepayments of the mortgage loans underlying our securities at a rate materially different than anticipated. ***Our diversified portfolio includes securities with prepayment characteristics that we expect to result in slower prepayments, such as pools of mortgage-backed securities collateralized by mortgages with low loan balances, mortgages originated under Fannie Mae's Expanded Approval Program or agency pools collateralized by loans against investment properties.***

\* \* \*

***We have created and will maintain a diversified portfolio*** to avoid undue geographic, loan originator, and other types of concentrations. By maintaining essentially all of our assets in

12

government or government-sponsored or chartered enterprises and government or federal agencies, which may include an implied guarantee of the federal government as to payment of principal and interest, we believe we can significantly reduce our exposure to losses from credit risk. We intend to acquire assets that will enable us to be exempt from the Investment Company Act.  [Emphasis added.]

31. With regard to the Company's strategies for countering market risk, the Prospectus, in relevant part, stated:

*We believe the primary risk inherent in our investments is the effect of movements in interest rates.* This arises because the changes in interest rates on our borrowings will not be perfectly coordinated with the effects of interest rate changes on the income from, or value of, our investments. *We therefore follow an interest rate risk management program designed to offset the potential adverse effects resulting from the rate adjustment limitations on our mortgage related securities. We seek to minimize differences between the interest rate indices and interest rate adjustment periods of our adjustable-rate mortgage-backed securities and those of our related borrowings.*

*Our interest rate risk management program encompasses a number of procedures, including the following:*

- *monitoring and adjusting, if necessary, the interest rate sensitivity of our mortgage related securities compared with the interest rate sensitivities of our borrowings;*

- *attempting to structure our repurchase agreements that fund our purchases of adjustable-rate mortgage-backed securities to have a range of different maturities and interest rate adjustment periods.* We attempt to structure these repurchase agreements to match the reset dates on our adjustable-rate mortgage-backed securities. At September 30, 2004, the weighted average months to reset of our adjustable-rate mortgage-backed securities was 5.1 months and the weighted average reset on the corresponding repurchase agreements was 3.7 months; and

- *actively managing, on an aggregate basis, the interest rate indices and interest rate adjustment periods of our mortgage related securities compared to the interest rate indices and adjustment periods of our borrowings.* Our liabilities under our repurchase agreements are all LIBOR-based, and we,

among other considerations, select our adjustable-rate mortgage-backed securities to favor LIBOR indexes. As of September 30, 2004, over 40% of our adjustable-rate mortgage-backed securities were LIBOR-based.

*As a result, we expect to be able to adjust the average maturities and reset periods of our borrowings on an ongoing basis by changing the mix of maturities and interest rate adjustment periods as borrowings mature or are renewed. Through the use of these procedures, we attempt to reduce the risk of differences between interest rate adjustment periods of our adjustable-rate mortgage-backed securities and those of our related borrowings.*

* * *

*As a further means of protecting our portfolio against the effects of major interest rate changes we may employ a limited hedging strategy* under which we purchase interest rate cap contracts (under which we would generally be entitled to payment if interest rate indices exceed the agreed rates) or rate lock or other guaranteed financing contracts (under which we would pay a fee to guarantee certain lines of borrowing at certain rates or for certain periods of time). *Under these contracts we would generally only be at risk for the fees paid. These contracts are intended to protect us from significant increases in interest rates.* [Emphasis added.]

32.     Additionally, regarding the Company's "Asset Tests," the Prospectus, in relevant part, stated:

*At the close of each quarter of our taxable year, we must satisfy four tests relating to the nature and diversification of our assets:*

- at least 75% of the value of our total assets must be represented by qualified real estate assets, cash, cash items and government securities;

- not more than 25% of our total assets may be represented by securities, other than those securities included in the 75% asset test;

- of the investments included in the 25% asset class, the value of any one issuer's securities may not exceed 5% of the value of our total assets, and we generally may not own more than 10% by vote or value of any one issuer's outstanding securities, in each case except with respect to securities of any qualified REIT subsidiaries or taxable REIT subsidiaries and in the case

14

of the 10% value test except with respect to "straight debt" having specified characteristics and other excluded securities, as described in the Internal Revenue Code, including, but not limited to, any loan to an individual or an estate, any obligation to pay rents from real property and any security issued by a REIT. In addition, (i) our interest as a partner in a partnership is not considered a security for purposes of applying the 10% value test; (ii) any debt instrument issued by a partnership (other than straight debt or other excluded security) will not be considered a security issued by the partnership if at least 75% of the partnership's gross income is derived from sources that would qualify for the 75% REIT gross income test, and (iii) any debt instrument issued by a partnership (other than straight debt or other excluded security) will not be considered a security issued by the partnership to the extent of our interest as a partner in the partnership; and

- the value of the securities we own in any taxable REIT subsidiaries, in the aggregate, may not exceed 20% of the value of our total assets.

Qualified real estate assets include interests in mortgages on real property to the extent the principal balance of a mortgage does not exceed the fair market value of the associated real property, regular or residual interests in a REMIC (except that, if less than 95% of the assets of a REMIC consists of "real estate assets" (determined as if we held such assets), we will be treated as holding directly our proportionate share of the assets of such REMIC), and shares of other REITs. Non-REMIC CMOs, however, generally do not qualify as qualified real estate assets for this purpose.

* * *

*We believe that all or substantially all of the mortgage related securities that we own are and will be qualifying assets for purposes of the 75% asset test.* However, to the extent that we own non-REMIC CMOs or other debt instruments secured by mortgage loans (rather than by real property) or debt securities issued by C corporations that are not secured by mortgages on real property, those securities may not be qualifying assets for purposes of the 75% asset test. *We will monitor the status of our assets for purposes of the various asset tests and will seek to manage our portfolio to comply at all times with such tests.* [Emphasis added.]

33.     Finally, the with regard to the Company's leverage strategy, the Prospectus, in relevant part, stated:

> *We seek to protect our capital base through the use of a risk-based capital methodology that is patterned on the general principles underlying the proposed risk-based capital standard* for internationally active banks of the Basel Committee on Banking Supervision. *We use our methodology to calculate an internally generated risk measure for each asset in our portfolio. This measure is then used to establish the amount of leverage we use. The goal of our approach is to ensure that our portfolio's leverage ratio is appropriate for the level of risk inherent in the portfolio.* [Emphasis added.]

34.     The statements contained in ¶¶ 30 – 33 were materially false and misleading when made because defendants failed to disclose or indicate the following:  (1) that the Company's interest costs at the time of the Secondary Offering were substantially increasing; (2) that as a result, the Company's various approaches to risk management did not provide investors reasonable protections against losses; and (3) that the Company lacked adequate internal and financial controls.

## The Opteum Financial Services ("OFS") Merger

35.     On September 29, 2005, the Company issued a press release entitled "Bimini Mortgage Management and Opteum Financial Services Sign Definitive Agreement to Merge." Therein, the Company, in relevant part, stated:

> Bimini   Mortgage   Management, Inc.   (the   "Company") (NYSE:BMM), a real estate investment trust that invests primarily in residential mortgage-related securities, today announced that it has signed a definitive merger agreement with Opteum Financial Services, a privately held home mortgage lender headquartered in Paramus, New Jersey.  With nearly 1,000 associates operating out of 30 offices and lending in 44 states, Opteum expects to originate or acquire approximately $7.4 billion in mortgage loans for the fiscal year ending November 30, 2005.  The transaction, in which Opteum will become a subsidiary of the Company, is expected to close in November 2005 and is subject to customary closing conditions. The Company expects the transaction will be accretive to earnings in 2006 and beyond.

> Commenting on the agreement, Jeffrey J. Zimmer, chairman, co-founder, president and chief executive officer of the Company,

said, "*This transaction represents an excellent opportunity for both companies. From our standpoint, we are diversifying our revenue stream while remaining in our area of expertise – the residential mortgage market. At the same time, we are establishing a broader base for future growth.* We have known members of Opteum's management team for a number of years and believe they are among the best and most experienced in the home mortgage business. We are excited about the opportunity to commit capital to them as all of our shareholders will benefit."

Peter R. Norden, chairman, co-founder, president and chief executive officer of Opteum Financial Services, added, "*We believe this transaction offers an excellent opportunity for our company and our employees on many fronts. The management team at Bimini is highly regarded for their in-depth knowledge of mortgage backed securities, their liquidity management skills, their capital markets expertise and their commitment to the application of best practices and low cost operations. We can continue to grow as opportunities present themselves as part of this very well run publicly held company and attract capital at more favorable rates.* That in turn will create new jobs and improved opportunities for our existing associates."

### Terms of the Agreement

*Under the terms of the agreement, Bimini has agreed to issue 3,717,242 shares of Class A Common Stock and 1,800,000 Convertible Preferred Shares in the merger to the stockholders of Opteum.* The new class of preferred shares would be convertible into Class A Common Stock of Bimini if Bimini's shareholders approve the conversion at a future shareholder meeting. *In addition, Bimini has agreed to lend approximately $65 million to Opteum to repay existing debt. Bimini has also agreed to pay the Opteum stockholders a contingent cash earn-out of up to $17.5 million over the next five years, based on achievement by Opteum of certain specific financial objectives. In return, Opteum has agreed that at the time of the merger it will have a book value of $60 million.* Opteum will operate from their headquarters in Paramus, New Jersey and as a taxable subsidiary of Bimini, which will retain corporate headquarters in Vero Beach, Florida. The three most senior executives of Opteum Financial Services have entered into long term employment contracts.

### Management

*Jeffrey J. Zimmer* will continue as chairman, president and chief executive officer of Bimini. *Peter R. Norden* will continue as

chairman, president and chief executive officer of Opteum and will become senior executive vice president and a director of Bimini. **Robert E. Cauley**, currently chief financial officer and chief investment officer of Bimini, will become vice chairman of the board of Bimini Mortgage Management, Inc. **Martin J. Levine**, co-founder of Opteum, will continue in his role as chief operating officer of Opteum. Jason Kaplan, who represents the family owning a large interest in Opteum, will join the Bimini board for a one-year term. No other senior management changes are planned. [Emphasis added.]

36.     Also on September 29, 2005, the Company issued a press release entitled "Bimini Mortgage Management Announces Second Private Placement of $50 Million of Trust Preferred Securities." Therein, the Company, in relevant part, stated:

Bimini   Mortgage   Management, Inc.   (NYSE:BMM)   today announced that it has agreed ***to issue and sell in a private placement $50.0 million of trust preferred securities*** through a newly formed trust subsidiary, Bimini Capital Trust II, organized under Delaware law. The trust preferred securities, which were priced at five year swap rates +350 basis points, will require quarterly distributions and will bear a fixed interest rate of 7.8575% through December, 2010 and thereafter the interest rate will float at the prevailing three-month LIBOR rate plus 3.50%. The securities are redeemable, in whole or in part, without penalty, at the option of Bimini any time on or after December, 2010. The securities will mature on December 15, 2035. Bimini intends to use the net proceeds of this private placement to help finance its recently announced merger with Opteum Financial Services, LLC.

Commenting on the issuance, Bimini Chairman, President and Chief Executive Officer, Jeffrey J. Zimmer, stated, ***"The Board of Directors of Bimini Mortgage Management, Inc. is very pleased to be able to issue 30-year unsecured debt that will allow us to lend money to Opteum following the merger on terms which are much better than Opteum's current debt."*** [Emphasis added.]

37.     On September 30, 2005, Opteum held a conference call with investors and financial analysts. During this call, the defendants, in relevant part, stated:

JEFFREY ZIMMER: ... ***The boards and the managements of these two enterprises have worked diligently on a merger and business plan that we expect will provide a future growth path of opportunities far greater than that as stand-alone companies.***

18

*The Bimini board sought to reduce the effect on Bimini and its shareholders from the income volatility and subsequent stock price volatility resulting from large short-term interest rate movements and accentuated by the inherent limitations imposed by REIT regulations.*

\* \* \*

*A primary focus was to achieve this diversification while capitalizing on the Company's management's core strengths, expertise in mortgages and investing, expertise in liquidity and risk management and expertise in Capital Market structuring.* Indeed, the board of Opteum had goals complementary to ours. In order to fund Opteum's growth in an efficient way through the public markets and gain investment in Capital Markets expertise needed to maximize those opportunities, the Opteum board sought out publicly traded companies as potential partners.

\* \* \*

*The Bimini board anticipates this merger will be accretive to earnings in 2006.* It is not yet clear if the merger will be accretive to earnings in the fourth quarter of 2005. Additionally the Bimini board and management team believe this merger will have a minimal effect at closing on Bimini's book value, although a snapshot as of yesterday would indicate a few cents dilution.

\* \* \*

*Opteum Financial Services currently uses gain on sale accounting for their securitizations. It is management's intention to change that to an on balance sheet financing business model for securitizations prior to the end of the second quarter of 2006. Both boards and management teams believe that an on balance sheet financing model will provide a more reliable return pattern to shareholders over a long period of time.* In the future bonds may be issued through Bimini at the REIT level, and Bimini may hold all or some classes of these issues with ratings from AAAI to unrated. At this time, however, the REIT parent company will continue to hold agency mortgage-related securities and has been granted authority by the board to purchase AAA private-label securities. The corporate structural changes will occur sometime in early 2006.

\* \* \*

PETER NORDEN: … *With this merger, both companies become part of a stronger diversified model whose parts complement*

*each other.* The ability to attract capital at very competitive rates will allow Opteum to continue to grow as opportunities present themselves as part of this very well-run publicly-held company. That, in turn, will create new jobs and improved opportunities for our existing associates. We look forward to our new endeavor as part of Bimini, and we are absolutely convinced that *together we can increase both shareholder value and returns on equity*.

\* \* \*

[ANALYST]: Can you characterize the 2005 origination volumes to date and kind of the product continuum?

PETER NORDEN: ... *One way we are different than most of our competition I have to say is that we originate all different products through all very different channels, and we're very diversified in everything that we do.*

*Most of our product is Alt-A*, what is considered Alt-A origination. And I would say primarily our Alt-A originations represent 65%, 65 to 70% of our overall production. We also produce a fair amount of prime business as well, Fannie Mae, Freddie Mac type business, and we do a small amount, and it is really the smallest piece of credit challenged individual. It really is a very small number, and all of those loans that are produced I will tell you are also all servicing released right after we originate those loans.

[ANALYST]: And the idea being that that product mix does not change much over the -- throughout the business plan that you have put in place for the merger?

PETER NORDEN: *The anticipation is it will stay that way, yes. Our concentration is on the Alt-A* and on the (inaudible) side for the most part.

\* \* \*

*Everything that we do we try -- I have a trading background myself years ago -- and everything we do is built to make sure that we hedge ourselves and make sure that we cover ourselves in every way that we possibly can.* So geographic diversity is very important to us, as well as product diversity so that we avoid the cycles of the mortgage banking business, which I think we have all seen. Anyone involved in a mortgage banking business has seen volatility in mortgage banking P&Ls. We really I think do a great job in leveling out those P&Ls by diversifying our product and diversifying geographically.

20

\* \* \*

[ANALYST]: I was wondering if you could discuss a little bit your plans on what kind of credit you're going to keep on the balance sheet when you're done, or what percentage you're going to sell, how you are going to work the mix in terms of -- and just make those decisions so we can get an idea what their credit profile is going to look like going forward?

JEFFREY ZIMMER: ... As we said in the comments that *we will own AAA securities. Those are very much akin to the portfolio that we have now, a modest step-up in credit card, if you will. As far as the lower rated tranches, Opteum has retained small pieces of those in the past, parts of the securitization and that may continue. But those numbers are very very small.*

JEFFREY ZIMMER: Yes, Jeff, to the extent that the return on equity analysis loss adjusted makes any of the subordinate tranches that Opteum is originating look good and accretive to the other businesses we have, we will take those all day long. *Everybody in this room right here has high comfort and high expertise in credit and mortgage credit specifically. So as time goes on, we will make the business decisions that we have made so far with the AAA sector.*

\* \* \*

[ANALYST]: *Sorry if I'm not congratulatory or calling you all highly regarded. I'm a portfolio manager who has held your stock since your IPO. I see this as a great change in your business model.* If you think the Fed is close to finished or you expect that mortgage REITs will trade up once they are finished, *why would you do this now? Why would you not sit back and as your assets prepay quickly use that cash to buy shares that are right now trading at a discount to book?*

JEFFREY ZIMMER: We are barely trading at a discount to book. But .95 or .96 I don't call that a discount big enough to go ahead and start buying shares, number one. Number two, Opteum has ROEs that are north of 20% right now on their business model. That is massively accretive to earnings. Number three, we have actually had an ROE of 14 or 15% this year. It is the highest in our sector, yet our stock is still $4 or $5 from the high. The entire equity investor world does not like the RMBS straight REIT model as the Fed raises rates.

\* \* \*

[ANALYST]: Well again, I repeat, if you expect the Fed to finish sometime in my history, then your own business model as you -- the RMBS business model should improve. And you're going out -- *you have credit exposure now that you did not have before. Every time I pick up a financial newspaper I'm told about the risks of just this kind of mortgage banking, and it is troubling.*

\* \* \*

[ANALYST]: *Well, why did you think of it a year ago before you did your IPO and you were diversified then?*

JEFFREY ZIMMER: ... *The board has thought this through very very well. We are very very* [sic] *pleased, and you as a shareholder should obviously be pleased as well.*

[ANALYST]: The 80 -- my final question -- the $86 million residuals, how much of it is I/O and how much of it is credit?

PETER NORDEN: ... If you look at the enhancement levels of AAA, they are far, far lower than they are in subprime. And *we run and the Company has run analysis on those, using what we view are very aggressive loss assumptions and still feel that those are fairly valued.*

\* \* \*

[ANALYST]: I just had a quick question about the servicing. *Do you currently run any sort of hedging program, and what does that entail? What type of securities do you own for that if you do?*

PETER NORDEN: Actually most of our servicing production, all of our portfolio for the most part has -- at this point is ARMs and it is relatively new paper. *We actually always view the origination channel as really our hedge against that servicing, and we write it off fairly quickly at the same time under the same assumption. So we have not been hedging the portfolio at this point in ,time but that may change with the merger and putting it together.*

[ANALYST]: Okay. And do you currently have the I guess expertise in place to do that, or would you have to hire out?

PETER NORDEN: I just want to add, Hunter Haus (ph) who joined the firm quite a while ago, not long after we joined the firm as you might recall, was involved in managing and servicing and hedging National City's portfolio which was over $200 billion.

[ANALYST]: Okay.

PETER NORDEN: And *he brings that in-house expertise*.

\* \* \*

[ANALYST]: *Can you tell me to what extent your assertion that this deal is going to be accretive to earnings in 2006 rests upon your outlook for origination volume?*

JEFFREY ZIMMER: We actually in our forward business plan we took 2006 -- 2005 originations and reduced them by 5%. We were being very conservative. And, quite frankly, their originations have been limited because they have not had access to good capital to expand it. *So that is a very very* [sic] *conservative number.*

PETER NORDEN: … We have an incredible production staff. They produce great quality products. They pretty much can produce whatever we need at anytime, whatever type of product we need. *So I am very confident that even though we ran the numbers with a drop in production next year, that we will be substantially higher anyway.* [Emphasis added.]

## Materially False and Misleading
## Statements Issued During the Class Period

38. The Class Period begins on November 3, 2005. On this day, the Company issued a press release entitled "Merger of Bimini Mortgage Management and Opteum Financial Services Completed." Therein, the Company, in relevant part, stated:

> Bimini Mortgage Management, Inc. (the "Company") (NYSE:BMM), a real estate investment trust that invests primarily in residential mortgage-related securities, today announced that it has completed its previously announced merger with Opteum Financial Services, LLC, a privately held home mortgage lender. Opteum will continue to operate from its headquarters in Paramus, New Jersey, as a taxable REIT subsidiary of Bimini, which will retain corporate headquarters in Vero Beach, Florida.
>
> Commenting on the closing of the transaction, Jeffrey J. Zimmer, chairman, co-founder, president and chief executive officer of the Company, said, "We are very pleased to have completed this transaction in a timely manner. *This merger benefits both companies. It allows Bimini to diversify its revenue stream while remaining in the Company's area of expertise. For Opteum, the merger provides increased access to capital to fund expanded*

*growth opportunities. Ultimately, we believe this merger will add long-term value for all of our shareholders."*

Under terms of the agreement, Bimini has issued approximately 3.7 million shares of Class A Common Stock and 1.8 million Convertible Preferred Shares in the merger to the stockholders of Opteum. The new class of preferred shares would be convertible into Class A Common Stock of Bimini if Bimini's shareholders approve the conversion at a future shareholder meeting. In addition, Bimini has lent to Opteum approximately $65 million to repay existing debt and Bimini may pay to Opteum stockholders a contingent earn-out of up to $17.5 million, payable partially in cash and partially in Convertible Preferred Shares, over the next five years, based on achievement by Opteum of certain specific financial objectives. [Emphasis added.]

39.     On February 6, 2006, the Company issued a press release entitled "Bimini Mortgage Management, Inc. Announces Corporate Name Change to 'Opteum Inc.' which stated, in relevant part:

Bimini Mortgage Management, Inc. (NYSE:BMM), a real estate investment trust (REIT) that invests in residential mortgage-related securities and originates loans through its taxable REIT subsidiary, Opteum Financial Services, today announced that the Company's Board of Directors voted unanimously to change its name to Opteum Inc. Effective Friday, February 10, 2006, Opteum Inc. will begin trading on the New York Stock Exchange as "OPX." No changes are planned for the corporate structure.

*"This name change leverages Opteum's current brand identity and further enhances the seamless integration of our two companies*," said Jeffrey J. Zimmer, Chairman, Chief Executive Officer and President of Opteum Inc. "Our branding effort now represents a unified image on all fronts with investors, customers and associates as we work toward our corporate mission of providing superior returns to our shareholders."

Peter R. Norden, Chief Executive Officer of Opteum Financial Services, added that *"this change reaffirms our brand position to be a company that is guided by integrity and strives to exceed our customers' and investors' expectations. When we re-branded our company as Opteum in 2003, we knew that we were creating a brand that would represent our company for the long-term."* [Emphasis added.]

40.     On February 23, 2006, the Company issued a press release entitled "Opteum Inc.

Reports Fourth Quarter and Full Year 2005 Results." Therein, the Company, in relevant part,

stated:

> Opteum Inc. ("Opteum") (NYSE:OPX), a real estate investment
> trust (REIT) that operates an integrated mortgage-related securities
> investment portfolio and a mortgage origination platform, today
> announced financial results for the fourth quarter ended December
> 31, 2005 and for the full year 2005.
>
> As previously announced on November 3, 2005, Opteum closed its
> acquisition of Opteum Financial Services, LLC ("OFS").
> Therefore, for the fourth quarter, the consolidated Company
> includes the results of Opteum's new taxable REIT subsidiary
> ("TRS"), OFS, for the period from November 3, 2005 through
> December 31, 2005. During the quarter, Opteum recorded a net
> loss according to generally accepted accounting principles
> ("GAAP") of approximately $2.7 million or $0.12 per diluted
> Class A Common Share as of December 31, 2005. Included in
> those consolidated results are fourth quarter earnings from
> Opteum's REIT segment of $3.9 million or $0.17 per Class A
> Common Share. OFS recorded a net loss of $6.6 million for the
> fourth quarter of 2005. *The loss at OFS is partially a result of the
> effects of the purchase accounting rules applied to OFS' assets at
> the date of the acquisition. The most significant effect was the
> OFS asset, "loans held for sale," which was adjusted to their fair
> value as of November 3, 2005. This fair value was higher than
> the book value of the loans prior to the acquisition. OFS
> subsequently sold many of the loans at approximately the same
> value as recorded on the acquisition date. Thus, the Company
> realized no gain on the subsequent sale of the loans, but the
> operating expenses of OFS remained.*
>
> For the full year 2005, Opteum had net income of approximately
> $24.3 million. See the Company's Consolidated Condensed
> Statement of Operations below.
>
> * * *
>
> Commenting on the results, Jeffrey J. Zimmer, Chairman,
> President and Chief Executive Officer, said, "The Opteum Board
> of Directors is pleased to be able to pay favorable dividends, but
> we are eagerly anticipating the time when the increases in short
> term funding rates comes to a halt. *The fourth quarter, as well as
> the entire year 2005, was a period when very short-term rates*

> *went up dramatically resulting in lower net interest income as compared with the fourth quarter of 2004 and the year 2004. The Company, in its REIT operations, began over 19 months ago to take steps to mitigate the continued impact of further interest rate movements initiated by the Federal Reserve by adding a greater proportion of adjustable-rate securities to the Company's REIT portfolio.*
>
> * * *
>
> Mr. Zimmer continued: "*The Board is pleased with the speed at which the successful integration of OFS is taking place and views the opportunity for diversified sources of income as a great benefit to all shareholders.* During the fourth quarter of 2005 OFS successfully issued its first securitization in REMIC form since being acquired by Opteum Inc. The underlying collateral for the issuance were loans originated or purchased by OFS, was $986 million in size, and was issued using OFS's securitization shelf called Opteum Mortgage Acceptance Corporation (OPMAC). It was OFS's fifth securitization for the year. For more details about our assets and liabilities, please see our annual filing on form 10-K for the year ended December 31, 2005, which the Board anticipates will be filed within the next few business days with the Securities and Exchange Commission." [Emphasis added.]

41.     On March 10, 2006, the Company filed its 2005 Annual Report with the SEC on Form 10-K. The Company's 10-K was signed by the Individual Defendants, and reaffirmed the Company's financial results previously announced on February 23, 2006.   Additionally, the Company, in relevant part, stated:

> **<u>Critical Accounting Policies</u>**
>
> Opteum's accounting policies are described in Note 1 to the Consolidated Financial Statements. *Opteum has identified the following accounting policies that are critical to the presentation of our financial statements and that require critical accounting estimates by management*.
>
> *Opteum's financial statements are prepared in accordance with U.S. generally accepted accounting principles ("GAAP").* These accounting principles require Opteum to make some complex and subjective decisions and assessments. Its most critical accounting policies involve   decisions   and   assessments   which   could significantly affect its reported assets and liabilities, as well as its

reported revenues and expenses. *Opteum believes that all of the decisions and assessments upon which its financial statements are based were reasonable at the time made* based upon information available to it at that time. Management has identified its most critical accounting policies to be the following:

## Mortgage Backed Securities

Opteum's investments in mortgage backed securities (the REIT investment portfolio) are classified as available-for-sale securities. As a result, *changes in fair value are recorded as a balance sheet adjustment to accumulated other comprehensive income (loss), which is a component of stockholders' equity, rather than through the statement of operations.* If available-for-sale securities were classified as trading securities, there could be substantially greater volatility in earnings from period-to-period.

*Valuations of Opteum's mortgage backed securities are carried on the balance sheet at fair value.* Statement of Financial Accounting Standards No. 107, Disclosures about the Fair Value of Financial Instruments, *defines the fair value of a financial instrument as the amount at which the instrument could be exchanged in a current transaction between willing parties. Opteum's mortgage backed securities have fair values determined by management* based on the average of third-party broker quotes received and/or by independent pricing sources when available. Because the price estimates may vary to some degree between sources, *management must make certain judgments and assumptions about the appropriate price to use to calculate the fair values for financial reporting purposes.* Different judgments and assumptions could affect the amounts Opteum could realize in a current market exchange.

When the fair value of an available-for-sale security is less than amortized cost, management considers whether there is an other-than-temporary impairment in the value of the security (for example, whether the security will be sold or repaid by the borrower prior to the recovery of fair value). *If, in management's judgment, an other-than-temporary impairment exists, the cost basis of the security is written down to the then-current fair value, and this loss is realized and charged against earnings.* The determination of other-than-temporary impairment is a subjective process, and different judgments and assumptions could affect the timing of loss realization.

*The decline in fair value of investments held in the portfolio at December 31, 2005 is not considered to be other than temporary.*

Accordingly, the write down to fair value is recorded in other comprehensive loss as an unrealized loss (see Note 1 to the financial statements). *The factors considered in making this determination included the expected cash flow from the investment and the magnitude and duration of the historical decline in market prices, as well as Opteum's capacity and intention to hold such securities owned.*

Interest income on mortgage related securities is accrued based on the actual coupon rate and the outstanding principal amount of the underlying mortgages. Premiums and discounts are amortized or accreted into interest income over the estimated lives of the securities using the effective yield method adjusted for the effects of estimated prepayments based on Statement of Financial Accounting Standards ("SFAS") No. 91, *Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases;* an amendment of Financial Accounting Standards Board ("FASB") Statements No. 13, 60, and 65 and a rescission of FASB Statement No. 17. *Adjustments are made using the retrospective method to the effective interest computation each reporting period based on the actual prepayment experiences to date and the present expectation of future prepayments of the underlying mortgages. To make assumptions as to future estimated rates of prepayments, Opteum currently uses actual market prepayment history for the securities and for similar securities that Opteum does not own and current market conditions. If the estimate of prepayments is incorrect;* [sic] *Opteum is required to make an adjustment to the amortization or accretion of premiums and discounts that would have an impact on future income.*

### Mortgage Loans Held for Sale

Mortgage loans held for sale represent mortgage loans originated and held pending sale to investors. *The mortgages are carried at the lower of cost or market as determined by outstanding commitments from investors or current investor yield requirements calculated on the aggregate loan basis.* OFS generally sells or securitizes loans with servicing rights retained. *Gains or losses on such sales are recognized at the time legal title transfers to the investor based upon the difference between the sales proceeds from the final investor and the allocated basis of the loan sold,* adjusted for net deferred loan fees and certain direct costs and selling costs. OFS defers net loan origination costs and fees as a component of the loan balance on the balance sheet. Such costs are not amortized and are recognized into income as a component of the gain or loss upon sale.

### Valuation Allowance

*A valuation allowance is maintained to adjust mortgage loans held for sale to the lower of cost or market.*

\* \* \*

### Risk Management Approach

*Opteum seeks to differentiate itself from other mortgage portfolio managers through its approach to risk management.* It invests in a limited universe of mortgage related securities, primarily, but not limited to, those issued by Fannie Mae, Freddie Mac and Ginnie Mae. Payment of principal and interest underlying securities issued by Ginnie Mae is guaranteed by the U.S. Government. Fannie Mae and Freddie Mac mortgage related securities are guaranteed as to payment of principal and interest by the respective agency issuing the security. *Opteum seeks to manage the risk of prepayments of the underlying mortgages by creating a diversified portfolio with a variety of prepayment characteristics. Finally, Opteum seeks to address interest rate risks by managing the interest rate indices and borrowing periods of its debt, as well as through hedging against interest rate changes.*

*Opteum has implemented a risk-based capital methodology patterned on the general principles underlying the proposed risk-based capital standards for internationally active banks* of the Basel Committee on Banking Supervision, commonly referred to as the Basel II Accord. The Basel II Accord encourages banks to develop methods for measuring the risks of their banking activities to determine the amount of capital required to support those risks. Similarly, *Opteum uses its methodology to calculate an internally generated risk measure for each asset in its portfolio. This measure is then used to establish the amount of leverage it uses. Opteum expects its risk management program to reduce its need to use hedging techniques.*

\* \* \*

### Management's Report on Internal Control over Financial Reporting

Management of Opteum Inc. (the "Company") is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934. *The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial*

29

*reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. The Company's internal control over financial reporting includes those policies and procedures that:*

(i)   pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;

(ii)  *provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorization of management and directors of the Company*; and

(iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

\* \* \*

*Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2005.* Management's assessment on internal controls did not include the internal controls of Opteum Financial Services, LLC which is included in the 2005 consolidated financial statements of the Company and constituted $1.1 billion and $49.9 million of total and net assets, as of December 31, 2005 and $3.4 million and $(6.6) million of total revenues and net income for the year then ended. Management did not assess the effectiveness of internal control over financial reporting at this entity because the Company did not have the ability to conduct an assessment of the acquired entity's internal controls over financial reporting during the time period from November 3, 2005, date of acquisition, through December 31, 2005, date of management's assessment. In making its assessment of the effectiveness of internal control, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework. Based on our assessment and those criteria, *management believes that the Company maintained effective internal control over financial reporting as of December 31, 2005.* [Emphasis added.]

42.   The Company's 10-K also contained Sarbanes-Oxley required certifications,

signed by Defendants Zimmer and Cauley, which stated:

> I, [Jeffrey J. Zimmer, Chief Executive Officer and President / Robert E. Cauley, Chief Financial Officer], certify that:
>
> 1.  I have reviewed this annual report on Form 10-K of Opteum Inc. (the "registrant");
>
> 2.  ***Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;***
>
> 3.  ***Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;***
>
> 4.  ***The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures*** (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) ***and internal control over financial reporting*** (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) ***for the registrant and have:***
>
>     a)  designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;
>
>     b)  ***designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principals;***

c)   *evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation;* and

d)   disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   *The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting*, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

a)   *all significant deficiencies and material weakness in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information;* and

b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

* * *

In connection with the Annual Report of Opteum Inc. (the "Company") on Form 10-K for the fiscal year ended December 31, 2005 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, [Jeffrey J. Zimmer, Chief Executive Officer / Robert E. Cauley, Chief Financial Officer] of the Company , hereby certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

1.   The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

2.   *The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.*  [Emphasis added.]

43.     On March 28, 2006, the Company issued a press release entitled "Opteum Reports Strong Demand for 'Affordability Products' as Home Prices Hold Steady and Interest Rates Continue to Climb."  Therein, the Company, in relevant part, stated:

> ***"The sharp upward trend in 'affordability products' this season is clear," says Alex Koutouzis, senior vice president for Opteum Financial Services, one of the nation's fastest growing mortgage lenders. "In fact, interest-only loans now make up almost 50 percent of the total share of mortgages in major competitive housing markets*** like San Diego, Atlanta and San Francisco."**
>
> ***Interest-only (IO) loans have become one of the industry's most popular products as they can help buyers afford a larger home and enjoy substantially lower payments for the initial term.*** The program is best suited for those who exhibit a proven track record for managing their finances well and understand the product's pros and cons. Opteum anticipates that 10-year IO products will continue to gain popularity, whereas demand for the two to three year (or shorter) IO term will drop dramatically.
>
> In addition, Opteum is experiencing a strong demand for the 40-year fixed rate balloon. This loan offers a payment nearly halfway between interest-only and 30-year fixed. The 40-year fixed works for buyers focused on the long-term value of their property and who want to build equity each month.  [Emphasis added.]

44.     On May 8, 2006, the Company issued a press release entitled "Opteum Inc. Reports First Quarter 2006 Results."  Therein, the Company, in relevant part, stated:

> Opteum Inc. ("Opteum") (NYSE:OPX), a real estate investment trust (REIT) that operates an integrated mortgage-related securities investment portfolio and mortgage origination platform, today announced financial results for the quarter ended March 31, 2006. This release should be read in conjunction with the Company's Form 10-Q, which was filed this afternoon with the Securities and Exchange Commission.
>
> For the quarter ended March 31, 2006, Opteum had REIT net income of $0.9 million, or $0.04 per weighted average Class A Common Share outstanding. The REIT had estimated taxable earnings of $1.3 million, or $0.06 per weighted average Class A Common Share outstanding. The taxable income results includes payments made by the Company's taxable REIT subsidiary, Opteum Financial Services (OFS), to the REIT of approximately

$1.8 million of interest on the $65 million loan that the REIT has made to OFS. That interest is not counted as revenue under generally accepted accounting principles (GAAP) since it is eliminated in consolidation of the subsidiary. Yet, that cash can and will be distributed to shareholders. Opteum Inc., which includes the results of OFS, recorded a net loss, on a GAAP basis, of approximately $5.1 million, or ($0.21) per weighted average Class A Common Share as of March 31, 2006. *Included in those consolidated results are first quarter operating results from OFS, which posted a GAAP net loss of $6.0 million after tax, or approximately ($0.26) per weighted average Class A Common Share outstanding for the first quarter of 2006. This loss was due to two specific accounting charges.*

First, the Company chose early adoption of SFAS 156, which pertains to the valuation of Originated Mortgage Servicing Rights (OMSR). The Company has elected to use the fair value method for valuing all OMSRs. As a result of this adoption, changes in the fair value of the OMSRs over a given period will be reflected in earnings. More importantly, *this change will allow the Company to hedge the OMSRs using the alternate accounting treatment to SFAS 133.* Although the initial adoption of SFAS 156, as of January 1, 2006, resulted in an increase in the value of the OMSRs by $4.3 million (pre-tax), which was booked to retained earnings, *the March 31, 2006 valuation resulted in a charge in OFS's earnings of $2.5 million (pre tax), or approximately ($0.11) per weighted average Class A Common Share outstanding.*

*The GAAP net loss at OFS is also a result of the change in the value of retained interests in securitizations that OFS has issued from its two private-label shelves.* The change in the value of these residuals flows through the statement of operations of OFS. The increase in one-month LIBOR of 44 basis points during the first quarter of 2006 was the primary reason for the valuation decline and resulting charge of $4.2 million (pre-tax) in the first quarter of 2006. This decline represents non-cash charges to earnings and is reflective of market conditions at the time. The valuation is subject to fluctuation over time due to the differences between actual and projected prepayments, losses on the underlying loans and the changing value of LIBOR. *Accordingly, management has made slight changes to the assumptions underlying the valuation as part of the implementation of the Company's hedging strategy in order to align the assumptions used in its hedge strategy with the valuation methodology.*

*The change in value of the OMSRs and the change in value of the residual interests represent approximately $6.7 million (pre-*

*tax) of the $20.2 million decline in book value for Opteum Inc. from December 31, 2005 to March 31, 2006.* The book value of Opteum Inc. as of March 31, 2006, was approximately $223.2 million or $9.67 per Class A Common Share outstanding on that date.

* * *

*The Company has not made any significant changes to its portfolio strategy since the summer of 2004, when the Company determined to substantially increase the asset allocation to adjustable-rate mortgages* - those mortgages that reset within 12 months. By the fall of 2004, this was accomplished. *Following this change, the Company has had the highest cumulative dividends and the highest cumulative return on equity for the following six quarters compared with the Company's 2005 RMBS peer group, as spelled out by the equity research analysts who cover the sector.*

Previously, the Board had determined not to provide earnings guidance for future periods unless the estimates by the equity analyst community were clearly out of line with management estimates. *As a result of this policy, the Board has determined that the Company should indeed provide earnings guidance for the REIT taxable income for the second quarter of 2006. The Company estimates that approximately $0.25 to $0.35 will be available to pay dividends from second quarter taxable earnings from the REIT.* This estimate does not incorporate any second quarter results from OFS. The Board has authorized management to update the public with this information if new data makes the estimates fall outside this range.

* * *

*In September of 2004 and December of 2004, respectively, the Company completed an IPO and a public secondary offering. Many of the assets that were purchased as a result of those successful offerings are now resetting to higher coupons.* In addition, because the longer end of the yield curve has increased in rate, the homeowner is not as readily in a position to refinance an adjustable-rate mortgage into a fixed-rate mortgage - as had been the case in previous quarters when the yield curve was flatter. *The Company believes that its strategy of owning low-duration adjustable-rate assets has proven to be successful. As of this date, the Company has not realized any permanent losses to book value as a result of portfolio restructuring.* Based on the Company's previous timing of dividend announcements, the

Company expects that the Board of Directors will declare a second quarter 2006 dividend sometime during the first two weeks of June 2006.

Commenting on the results, Jeffrey J. Zimmer, Chairman, President and Chief Executive Officer, said, "The Opteum Board of Directors is pleased both to be able to pay favorable dividends for the first quarter of 2006 and *to present expectations of favorable earnings for the second quarter 2006*...

* * *

*"The Board is pleased with the speed at which the successful integration of OFS is taking place and views the opportunity for diversified sources of income as a great benefit to all shareholders. Moreover, the Board anticipates the hedging program for OMSRs and residuals to commence during the second quarter of 2006 so as to reduce the volatility of the earnings results at OFS.* During the first quarter, OFS successfully issued its first 2006 securitization in REMIC form. ...

* * *

Mr. Zimmer went on to say, "The competition in mortgage originations has continued into the second quarter. *Although the Company does not expect origination levels to remain below expectations throughout the entire year, we have taken steps to reduce costs at OFS.* In the first quarter of 2006, the Company reduced non-origination personnel expenses at OFS by over $3.5 million as measured on an annual basis. Additional efficiencies are in the process of being implemented. In addition, as a taxable REIT subsidiary of Opteum Inc., OFS has been able to take advantage of significant reductions in the rate it pays to finance its mortgage pipeline and owned assets. On an annualized basis, OFS has reduced borrowing costs by approximately $3.5 million per year. *Finally, we believe that OFS financial results will benefit on an ongoing basis from the capital markets expertise that the REIT management team is rigorously applying to the OFS securitization strategy."* [Emphasis added.]

45.    Also on May 8, 2006, Opteum filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q was signed by Defendants Zimmer and Cauley, and reaffirmed the Company's financial results previously announced. The Company's 10-Q also contained Sarbanes-Oxley required certifications, substantially similar to the certifications contained in

¶42, *supra*.  Additionally, the Company, in relevant part, stated:

### Interim Financial Statements

The accompanying interim financial statements reflect all adjustments, consisting of normal recurring items that, *in the opinion of management, are necessary for a fair presentation of the Company's financial position, results of operations, statement of stockholder equity and cash flows for the periods presented.* These interim financial statements have been prepared in accordance with disclosure requirements for interim financial information and accordingly, they may not include all of the information and footnotes required by U.S. generally accepted accounting principles ("GAAP") for annual financial statements. The operating results for the interim period ended March 31, 2006 are not necessarily indicative of results that can be expected for the year ended December 31, 2006. The operating results of the interim period ended March 31, 2005 do not include the results of OFS, as the merger closed in November 2005. The financial statements included as part of this Form 10-Q should be read in conjunction with the financial statements and notes thereto included in the Company's Annual Report on Form 10-K for the year ended December 31, 2005.

### Basis of Presentation and Use of Estimates

*The accompanying consolidated financial statements are prepared on the accrual basis of accounting in accordance with GAAP.* The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. Significant estimates affecting the accompanying financial statements include the fair values of mortgage backed securities, the prepayment speeds used to calculate amortization and accretion of premiums and discounts on mortgage backed securities, the deferred tax liability valuation, the valuation allowance on mortgage loans held for sale, the valuation of derivative financial instruments and the fair value of mortgage servicing rights.

### Consolidation

The accompanying March 31, 2006 consolidated financial statements include the accounts of Opteum and its wholly-owned

subsidiary, OFS, as well the wholly-owned and majority owned subsidiaries of OFS. Opteum uses the equity method to account for other investments for which it has the ability to exercise significant influence over operating and financial policies. Consolidated net earnings of Opteum include Opteum's share of the net earnings (losses) of these companies, if any. The inter-company loan and all other material inter-company accounts and transactions have been eliminated from the consolidated financial statements.

\* \* \*

### Evaluation of Disclosure Controls and Procedures

*The Company maintains disclosure controls and procedures* that are designed to ensure that information required to be disclosed in the Company's Exchange Act reports is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure based closely on the definition of "disclosure controls and procedures" in Rule 13a-15(e). ...

*As of the end of the period covered by this report, the Company carried out an evaluation, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and the Company's Chief Financial Officer, of the effectiveness of the design and operation of the Company's disclosure controls and procedures. Based on the foregoing, the Company's Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective.*

### Changes in Internal Controls over Financial Reporting

There have been no changes in the Company's internal controls over financial reporting identified in connection with the calculation of such internal controls that occurred during the Company's last fiscal year or in other factors that could have materially affected, or are reasonably likely to materially affect the Company's internal controls subsequent to the date the Company completed its evaluation. [Emphasis added.]

46.    On August 8, 2006, the Company issued a press release entitled "Opteum Inc.

Reports Second Quarter 2006 Results." Therein, the Company, in relevant part, stated:

Opteum Inc. ("Opteum", the "Company") (NYSE:OPX), a real estate investment trust (REIT) that operates an integrated mortgage-related securities investment portfolio and mortgage origination platform, today announced financial results for the quarter ended June 30, 2006. This release should be read in conjunction with the Company's Form 10-Q, which was filed this morning with the Securities and Exchange Commission.

For the quarter ended June 30, 2006, Opteum had REIT net income of $7.52 million, or $0.31 per weighted average Class A Common Share outstanding. The REIT had estimated taxable income of $9.99 million, or $0.42 per weighted average Class A Common Share. Taxable income includes payments made by the Company's taxable REIT subsidiary, Opteum Financial Services (OFS), to the REIT of approximately $2.2 million of interest on the loans that the REIT has made to OFS, which is eliminated in consolidation of the subsidiary.

*Opteum Inc., which includes the results of OFS, recorded a consolidated net loss for the second quarter of 2006, on a GAAP basis, of approximately $3.69 million, or ($0.15) per weighted average Class A Common Share as of June 30, 2006.*

*The Company's reported net loss for the second quarter is mainly a result of the change in value of assets held by OFS,* which flow through the consolidated statement of operations, some of which have increased in value and some of which have decreased in value.

First, the Company's adoption of SFAS 156 during the first quarter of 2006, which pertains to the valuation of Originated Mortgage Servicing Rights (OMSR), requires the Company to use the fair value method for valuing all OMSRs. As a result of this adoption, changes in the fair value of the OMSRs over a given period will be reflected in earnings. *This change allows the Company to more effectively hedge the OMSRs compared with the treatment available under SFAS 133.* OMSR's resulted in an increase in OFS's earnings of $3.3 million (pre-tax), or approximately $0.14 per weighted average Class A Common Share during the second quarter of 2006.

Secondly, the net change in the value of retained interests in securitizations that OFS has issued from its two private-label shelves declined in value during the second quarter of 2006. *The change in the value of these residuals flows through the statement of operations of OFS. The increase in one-month LIBOR of 50.5 basis points during the second quarter of 2006, as*

*well as related movements in forward LIBOR, were the primary reasons for the valuation decline and the resulting non-cash charge of $15.8 million (net and pre-tax) in the second quarter of 2006 or $0.69 (net and pre-tax) weighted average Class A Common Share.* The valuation is subject to fluctuation over time due to the differences between actual and projected prepayments, losses on the underlying loans and the changing value of LIBOR.

Although the Company estimates that the book value per weighted average Class A Common Share outstanding as of the close of business yesterday, August 7, 2006, was between $8.45 and $8.60, the book value of the Company as of June 30, 2006 was $8.22 per weighted average Class A Common Share outstanding or approximately $200 million. *The recovery in book value per weighted average Class A Common Share outstanding can be attributable to favorable changes in the forward LIBOR curve and lower treasury rates since the end of the second quarter, offset by application of the effective yield method adjustment for the third quarter.*

* * *

*In September of 2004 and December of 2004, respectively, the Company completed an IPO and a public secondary offering. Many of the assets that were purchased as a result of those successful offerings are now resetting to higher coupons.* In addition, because the longer end of the yield curve has increased in rate during the second quarter of 2006, the homeowner was not in a position to refinance as readily from an adjustable-rate mortgage into a fixed-rate mortgage - as had been the case in previous quarters when the yield curve was flatter. *The Company believes that its strategy of owning low-duration, adjustable-rate assets has proven to be successful. As of this date, the Company has not realized any net permanent losses to book value as a result of portfolio restructuring.*

*The Company has not made any significant changes to its portfolio strategy since the summer of 2004*, when the Company determined to substantially increase the asset allocation to adjustable-rate mortgages - those mortgages whose coupons reset within 12 months. By the fall of 2004, this was accomplished. Following this change, the Company has had the highest cumulative dividends and the highest cumulative return on equity for the following seven quarters compared with the Company's 2005 RMBS peer group, as spelled out by the equity research analysts who cover the sector.